**STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS**

*In re* **J.T.**

**No. 25-363** (Ohio County CC-35-2024-JA-46)

## MEMORANDUM DECISION

Petitioner Mother P.T.[1] appeals the Circuit Court of Ohio County's May 27, 2025, order terminating her parental rights to J.T., arguing that the DHS did not fulfill its obligation to provide sufficient reunification services and that the circuit court erred in denying her motion to continue and terminating her parental rights.[2] Upon our review, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21.

In May 2024, the DHS filed a petition alleging that the petitioner, who had recently given birth to J.T., had a history of violent relationships (including with J.T.'s father) and exhibited signs of untreated mental health issues (including hallucinations), substance abuse, and intellectual impairment. Despite suffering from bipolar disorder, anxiety, psychosis, and schizophrenia, the petitioner reported to the DHS that she did not take her prescribed medications because she believed they caused her to hallucinate "ghosts and witches." Accordingly, the DHS alleged that the petitioner was unable to properly care for the child.

The DHS was granted emergency custody of the child, who was initially removed from the home. However, at the preliminary hearing on May 23, 2024, the parties agreed to return the child to the parents' physical custody (with the DHS retaining legal custody) upon several conditions, including that several individuals would perform daily checks on the child and providers would continue working with the family to ensure the child attended medical appointments. The court then continued the preliminary hearing so the DHS could assess the parents' ability to appropriately parent the child.

In June 2024, the circuit court held a status hearing and was informed that the parents expressed disinterest in participating in an improvement period at a multidisciplinary team meeting following the last hearing. In response, the petitioner argued that the parents were complying with

---

[1] The petitioner appears by counsel Michael B. Baum. The West Virginia Department of Human Services ("DHS") appears by counsel Attorney General John B. McCuskey and Assistant Attorney General Lee Niezgoda. Counsel Joseph J. Moses appears as the child's guardian ad litem.

[2] We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

services and that the case should not have been filed. As such, the petitioner moved to dismiss the petition. The parties then discussed a prior Child Protective Services ("CPS") case against the mother in Ohio concerning her three older children[3] and a report from a Court Appointed Special Advocate ("CASA") that raised concerns over the parents requiring intensive assistance to properly parent. The court noted that the parents needed "to understand that a network of social workers cannot be in their home at all times" and that they would have to demonstrate an ability to care for the child on their own. Citing the "legitimate concerns" over their inability to properly parent, the court denied the motion to dismiss. The court permitted the child to remain in the parents' physical custody and set the matter for adjudication. Shortly after this hearing, the court ordered the parents to participate in psychological evaluations. However, the DHS filed a motion to reschedule the adjudicatory hearing after the parents refused to attend their scheduled psychological evaluations, which the court granted.

Before the continued adjudicatory hearing was held, the DHS filed a motion for physical custody of the child in August 2024, alleging that the parents had not been fully compliant with services. Regarding the rescheduled psychological evaluations, the DHS alleged that several issues occurred. Despite being instructed to arrange childcare during the evaluations, the parents failed to do so; despite being informed the evaluations would take most of the day, the parents informed the evaluator that they could stay only one hour; and the evaluator ended the petitioner's evaluation early because of her aggressive, erratic behavior. Specifically, the petitioner was "yelling, crying, and cussing at the receptionist" after hearing the father laugh during his evaluation in another room. When confronted by the psychologist, the petitioner "slammed the door in [her] face." In response to the petitioner's behavior, the father stated, "she does this all the time." Accordingly, the DHS alleged that the child was unsafe in the parents' custody. Upon the parents' waiver of the subsequent preliminary hearing regarding custody, the court transferred physical custody of the child to the DHS.

In September 2024, the petitioner completed her psychological evaluation. At an adjudicatory hearing the following month, the petitioner stipulated to her adjudication, admitting that her borderline intellectual abilities impacted her parenting abilities. Accordingly, the court adjudicated the petitioner of abusing and/or neglecting the child. Following the hearing, the petitioner filed a written motion for a post-adjudicatory improvement period. In November 2024, the court was "informed that the parties have agreed upon terms for improvement periods, only for an initial period of 3 months to see how [the parents] comply," with an agreement that the improvement periods "may be extended to a full . . . 6 months." The extensive terms of the petitioner's improvement period required her to, among other things, participate in specific services to aid her in developing adaptive living skills; attend a weekly domestic violence group to address her issues with domestic violence; comply with her psychological evaluation and follow any recommendations thereof; work with a provider to obtain an appropriate therapist who is "sensitive to her comprehension issues" and participate in such therapy; engage in couple's therapy, when deemed appropriate, to learn how to properly co-parent; take all medications as prescribed; obtain independent housing; and participate in adult life skills and parenting services.

---

[3] The older children had been in a legal guardianship with their grandmother for several years prior to the petition's filing and are not at issue on appeal.

In a February 2025 case plan, the DHS sought termination of the petitioner's parental rights. According to the DHS, despite a "long and extensive" CPS history, the petitioner "always put her needs ahead of those of her children." The DHS asserted that the petitioner had "done nothing during the pendency of this case to work on or correct her deficits" and accepted no responsibility for her actions, instead choosing to blame others. The DHS detailed the petitioner's visitation history, including several cancellations and her inappropriate behavior during visits, such as refusing to hold the child because she claimed J.T. did not like her after the child cried in her arms. Specifically, the DHS indicated that the petitioner "acted erratically yelling and screaming with the . . . father and others in front of her child during a visit creating a hostile and violent environment and placing her child in danger." Further, the petitioner failed to attend domestic violence services as required. The DHS ultimately believed that "the risk of abuse and/or neglect remain[ed] substantial" given the petitioner's inability to appropriately care for the child.

On March 2, 2025, the petitioner filed a motion to continue the dispositional hearing scheduled for the following day because she had been admitted to a mental health facility. At the hearing, the petitioner's counsel claimed that a DHS transportation provider abandoned the petitioner in Fairmont, which resulted in her subsequent hospitalization. However, the DHS asserted that the petitioner was verbally aggressive and refused transportation. Noting that the matter had been pending for ten months, the circuit court denied the motion to continue because it would likely require two days to conduct the entire hearing, and the petitioner could potentially appear later. The court then proceeded to take evidence on disposition. The father testified to the petitioner's history of mental health issues; explained that the petitioner displayed volatile behavior, including chasing him with a knife; and admitted that their relationship was toxic. According to the father, much of this conduct worsened over the course of the proceedings and especially deteriorated in the weeks leading up to this dispositional hearing. The court then heard testimony from the psychologist who evaluated the petitioner, who explained that the petitioner's prognosis for improved parenting was "very poor." This was based on the psychologist's conclusion that the petitioner was incapable of safely parenting even with services, as her borderline intellectual functioning, poor judgment, and impulsivity could not be corrected. In fact, the psychologist explained that the petitioner's deficits were so great that she was not capable of properly caring for herself. According to the psychologist, the petitioner did not "seem to understand that what [she] did was wrong."

The petitioner appeared for the April 2025 continued dispositional hearing. A CPS worker testified to the petitioner's inconsistent participation with the extensive services offered during the proceedings, including her failure to comply with mental health treatment or to take her medication as directed. Regarding these services, the CPS worker explained that the DHS gave information to providers "so they would know . . . what specifically to address with" the petitioner and the terms of the petitioner's improvement period "incorporate[d] the special requests for the [petitioner] recommended by any of the treatment providers . . . or the . . . psychologist." The worker also explained that she discussed with parenting providers that they would use a "Step-by-Step parenting curriculum" to accommodate the petitioner's intellectual issues. The CPS worker also detailed the petitioner's inability to safely care for the child as evidenced by, among other things, the unsafe feeding practices demonstrated during supervised visits. According to the CPS worker, the petitioner had no understanding of what she needed to improve in order to appropriately parent.

3

Finally, the petitioner testified to her compliance with certain services and her avoidance of drugs and alcohol. Ultimately, the court found that the DHS had attempted to accommodate the petitioner's intellectual issues during her improvement period. Despite the DHS's assistance, the court found that the petitioner failed in her improvement period and did not comply with services. In fact, the court found that there were no additional services that could be provided to address the petitioner's issues. The court further concluded that the petitioner was "not capable of caring for herself, let alone an infant," based on her "serious intellectual deficiencies, very serious psychological issues, and personality disorders." Accordingly, the court found that there was no reasonable likelihood that the petitioner could substantially correct the conditions of abuse and neglect and, noting the child's need for permanency, that the child's welfare required termination. As such, the court terminated the petitioner's parental rights to the child.[4] It is from the dispositional order that the petitioner appeals.

On appeal from a final order in an abuse and neglect proceeding, this Court reviews the circuit court's substantive rulings for abuse of discretion, factual findings for clear error, and issues of law de novo. Syl. Pt. 1, *In re K.S.*, -- W. Va. --, 930 S.E.2d 400 (2026). Before this Court, the petitioner first argues that the DHS failed to fulfill its obligation to provide reasonable accommodations and appropriately tailored reunification services to account for her intellectual and mental health disabilities. In support, the petitioner cites to West Virginia Code § 49-4-604(c)(5)(C), which provides that, when imposing disposition under this section, the "court order shall state . . . [w]hether the department has made reasonable accommodations in accordance with the Americans with Disabilities Act of 1990, 42 U. S. C. § 12101 *et seq.*, to parents with disabilities in order to allow them meaningful access to reunification and family preservation services." The petitioner's reliance on this language is unavailing for several reasons. First, the circuit court did not impose disposition under this section. Instead, it terminated her parental rights under West Virginia Code § 49-4-604(c)(6), which does not contain such language. Second, even assuming this language applied, the petitioner fails to cite to the Americans with Disabilities Act or any portion of the record to demonstrate that she has a disability covered by that Act. Notably, the petitioner fails to acknowledge our prior direction that, in situations where neglect is a result of a parent's "intellectual incapacity . . . and their consequent inability to adequately care for their children, termination of rights should occur only after the social services system makes a thorough effort to determine whether the parent(s) can adequately care for the children with intensive long-term assistance." Syl. Pt. 4, in part, *In re Billy Joe M.*, 206 W. Va. 1, 521 S.E.2d 173 (1999). We have explained that "the determination of whether the parents can function with such assistance should be made as soon as possible in order to maximize the child(ren)'s chances for a permanent placement." *Id.* Here, the record establishes that the DHS made a thorough effort to provide the petitioner with extensive services tailored to her needs, yet she refused to participate. Further, during the dispositional hearing, the psychologist who evaluated the petitioner opined that no amount of services could remedy the petitioner's parenting deficiencies. Accordingly, we find that the circuit court did not err in proceeding to disposition.

---

[4] The father's rights were also terminated. The permanency plan for the child is adoption in the current placement.

4

The petitioner next argues that the circuit court erred in denying her motion to continue the dispositional hearing.[5] This Court has held that "[a] motion for continuance is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of discretion." Syl. Pt. 3, in part, *In re Mark M.*, 201 W. Va. 265, 496 S.E.2d 215 (1997) (quoting Syl. Pt. 2, *State v. Bush*, 163 W. Va. 168, 255 S.E.2d 539 (1979)). "Whether there has been an abuse of discretion in denying a continuance must be decided on a case-by-case basis in light of the factual circumstances presented, particularly the reasons for the continuance that were presented to the trial court at the time the request was denied." *In re Mark M.*, 201 W. Va. at 266, 496 S.E.2d at 216, Syl. Pt. 4 (quoting *Bush*, 163 W. Va. at 169, 255 S.E.2d at 540, Syl. Pt. 3). In support of this assignment of error, the petitioner argues only that the court denied her the opportunity to be heard. *See* W. Va. Code § 49-4-601(h) ("In any proceeding pursuant to this article, the party or parties having . . . parental rights or responsibilities to the child shall be afforded a meaningful opportunity to be heard, including the opportunity to testify and to present and cross-examine witnesses."). However, the record is clear that the court permitted the parties to present evidence in support of disposition at the initial hearing with the understanding that the petitioner would be present at the continued hearing. The petitioner was, in fact, present at the subsequent April 2025 dispositional hearing and testified on her own behalf. She was additionally represented by counsel at both hearings, and counsel presented evidence and cross-examined witnesses on her behalf. As such, it is clear that the petitioner was afforded the right to be heard, and the circuit court did not err in denying her a continuance.

Finally, the petitioner argues that termination of her parental rights was error as a less restrictive dispositional alternative was more appropriate. In order to terminate parental rights, a court must find that there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected and that it is necessary for a child's welfare. W. Va. Code § 49-4-604(c)(6). Despite the petitioner's argument that the conditions at issue were correctable and that termination was not necessary for the child's welfare, the evidence below overwhelmingly supports the circuit court's findings to the contrary. Not only did the DHS introduce evidence of the petitioner's failure to fully comply with services and continuous inability to parent, but the psychologist that evaluated her testified that no amount of services could correct the conditions of abuse and neglect. This is sufficient for the court's finding that there was no reasonable likelihood the petitioner could correct the conditions of abuse and/or neglect. *See* W. Va. Code § 49-4-604(d) ("'No reasonable likelihood that conditions of neglect or abuse can be substantially corrected' means that . . . the abusing . . . [has] demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help."). As we have explained, "[t]ermination of parental rights . . . may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood . . . that conditions of neglect or abuse can be substantially corrected." Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011) (quoting Syl. Pt. 2, *In re R.J.M.*, 164 W. Va. 496, 266 S.E.2d 114 (1980)). Further, termination was

---

[5] The petitioner filed a second motion to continue at the April 2025 dispositional hearing. However, in her argument before this Court, the petitioner argues that her *absence* at disposition necessitated a continuance. The petitioner was present for the April 2025 hearing. Accordingly, we address only the circuit court's denial of the petitioner's motion to continue the March 2025 dispositional hearing.

5

necessary for the child's welfare given the need for permanency. Contrary to the petitioner's assertion of a strong bond with the child, the evidence shows that she was indifferent toward J.T. after the child cried when being held. As such, the court did not err in terminating the petitioner's parental rights.[6]

For the foregoing reasons, the circuit court's May 27, 2025, order is hereby affirmed.

Affirmed.

**ISSUED:** July 28, 2026

**CONCURRED IN BY:**

Chief Justice C. Haley Bunn
Justice William R. Wooton
Justice Charles S. Trump IV
Justice H. L. Kirkpatrick
Justice James W. Flanigan

---

[6] In support of this assignment of error, the petitioner also argues that the circuit court should have granted her a post-dispositional improvement period. However, she cites to no portion of the appendix where she filed a written motion for the same. "A circuit court may not grant a[n] . . . improvement period under W. Va. Code § 49-4-610 . . . unless the respondent to the abuse and neglect petition files a written motion requesting the improvement period." Syl. Pt. 4, in part, *State ex rel. P.G.-1 v. Wilson*, 247 W. Va. 235, 878 S.E.2d 730 (2021). Accordingly, she is entitled to no relief.

Additionally, the petitioner raises another assignment of error alleging that the circuit court erred in granting her only a three-month post-adjudicatory improvement period. Not only does West Virginia Code § 49-4-610(2) permit a court, upon certain conditions, to "grant a respondent an improvement period of a period not to exceed six months," but the record demonstrates that the parties—including the petitioner—*agreed* to a three-month improvement period. As such, the petitioner has waived her right to challenge the court's award of a three-month post-adjudicatory improvement period on appeal. *See Noble v. W. Va. Dep't of Motor Vehicles*, 223 W. Va. 818, 821, 679 S.E.2d 650, 653 (2009) ("'Our general rule is that nonjurisdictional questions . . . raised for the first time on appeal, will not be considered.' *Shaffer v. Acme Limestone Co., Inc.*, 206 W.Va. 333, 349 n. 20, 524 S.E.2d 688, 704 n. 20 (1999).").

6